(No. 24846.—

The Olympic Commissary Company, Defendant in Error, *vs.* The Industrial Commission *et al.*—(John Dugan, Plaintiff in Error.)

*Opinion filed February 15, 1939—Rehearing denied April 5, 1939.*

WELSH & WELSH, (R. T. WELSH, of counsel,) for plaintiff in error.

HALL & DUSHER, and HOWARD & GREENE, (WILLIAM GREENE, of counsel,) for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here on writ of error to review the judg-ment of the circuit court of Winnebago county which set aside the finding and award of the Industrial Commission, on the ground that the injury complained of did not arise out of and in the course of the employment of plaintiff in error, Dugan, with defendant in error, the Olympic Com-missary Company.

On July 11, 1936, Dugan suffered a broken back re-sulting in the paralysis of both legs as result of a fall from a moving train. On hearing, the arbitrator found that he was totally disabled through the loss of use of both legs; that the accident arose out of and in the course of his em-ployment with the commissary company; that $2632.45 medical and hospital expenses had been incurred but were unpaid, and awarded Dugan medical and hospital bills, $7.50 per week for the period of 370 weeks, one week at $2.50, and a pension of $27.85 per month for life. The Indus-trial Commission affirmed the award. Dugan contends here

that the accident arose out of and in the course of his employment with the commissary company. The latter also makes, here, an issue of Dugan's employment, arguing that he was an employee of the railway company and not of the commissary company.

The undisputed facts are that the Olympic Commissary Company was under contract with the Chicago, Milwaukee and St. Paul Railroad Company to furnish board and lodging to approximately 150 men working for the railway company. The former, through one Jack Maline, its commissary clerk, and its other employees, had charge of purchasing, storing, cooking and serving the food, and furnishing sleeping quarters for the workmen of the railway company. The railway company allowed the use of cars for supplying said board and lodging at a camp, which consisted of several cars located on a side-track one-half mile east of the railroad station at Genoa.

On June 10, 1936, Dugan applied at the camp office for employment and Maline employed him as a yardman. His wages were $20 per month, room and board. There were three yardmen employed by Maline. Their duties were to look after the supplies and get them up to the camp from the depot, look after the pump and light plant and to clean the kitchen and dining cars. It is agreed that their duties were mainly routine. There is something said in the argument of the commissary company that Dugan's duties were those of a janitor. We are of the opinion, however, that the evidence showed his duties to have been those of a yardman and not of a janitor. Two other men were thus employed when Dugan entered the employment. One was known as No. 1 yardman. He had the keys to the refrigerator car and the dry-stores cars. After Dugan had been employed about fifteen days he became No. 1 yardman and received the keys to the refrigerator and dry-stores cars. It was Dugan's duty to go to the station for supplies. Each morning he met the local freight, and at 1:30 P. M.

met the passenger train, known as No. 4, on which perishable foodstuffs came in. Sometimes he went alone and sometimes he was accompanied by other yardmen. He usually took a small flat car known as a "push car" to bring up the supplies. On July 11, 1936, the camp was moved to the neighborhood of the town of Kirkland. An engine of the railway company was used for that purpose.

Practically the only dispute in the facts arises concerning conversations had between Maline and Dugan about the time the camp train was moved. Dugan testified that he had a conversation with Maline in which Maline told him that No. 4 train was late and, as they were moving the camp, they would pick up the supplies at Genoa as the camp train passed, and put them directly in the refrigerator car. Dugan then rearranged the goods in the refrigerator car so as to be prepared to take the new goods from the door next to the station as they passed. It was found, when the camp train reached the station at Genoa on its way to Kirkland, that train No. 4 had not yet arrived. Dugan testified that he then had another conversation with Maline about the supplies and that Maline told him he had wired Kirkland to have the supplies dropped at Kirkland, and so Dugan and the other yardmen prepared the refrigerator car to take care of the loading at Kirkland. It appears that when the cars forming the camp reached Kirkland, No. 4 had not arrived and as two of the cars were tank cars, used for keeping fresh water for the use at the camp, they, with the refrigerator car, were moved from the new camp to the station at Kirkland for the purpose of filling the tank cars at the water tank there and of picking up the perishable goods when they came.

Maline testified for the commissary company. He stated that he did not recall having any conversations with Dugan about his going with the refrigerator car until they reached the "Y" beyond Kirkland, on which the train was turning around; that he then told Dugan that he had made arrange-

ments with another yardman, Richter, to wait at the depot and meet No. 4 and look after the vegetables expected, and that Dugan should stay at the camp and fix up the water connections and drain pipe in the kitchen, and that it ordinarily took a couple of hours to take care of this work after the camp was moved from one location to another. Richter was not in the State at the time of the hearing before the arbitrator and the commission and so his testimony was not taken.

As the camp train, which consisted of sleeping cars, dining cars, refrigerator and storage cars, kitchen car, two tank cars for water and a pump car, first moved to the new camp, Dugan rode in the pump car with Maline. According to Dugan's testimony Maline there told him that the refrigerator car would be taken to the depot at Kirkland to save Dugan an extra trip with the push car. This was done, and the refrigerator car and the two tank cars were uncoupled and returned to the station at Kirkland. On this trip Dugan rode in the empty coal compartment of one of the tank cars. Maline rode on a ladder on the north side of the refrigerator car. As the train approached the station it could be seen that no supplies had yet arrived. Therefore, without stopping, the cars were pulled down about 150 feet west of the station and stopped at the water spout to fill the tanks. Dugan got out of the coal compartment, onto the top of the tank, pulled the water spout down and filled the tank. With this done he returned to the coal compartment, and the train started back to camp. When it arrived almost opposite the station Dugan, due to a jolt, lost his balance and fell off the end of the tank car, between it and the second tank car. One car and one-half of another passed over Dugan before the train was stopped. He was taken out from under the train and it was found he had sustained a fracture of the second lumbar vertebra, fracture of two ribs and various lacerations on his scalp, neck and shoulders. When he was taken out Dugan gave

the keys to the refrigerator and dry-stores cars to Maline and was taken to a hospital where he remained and was at the time of the hearing.

Maline testified that he had told Dugan to remain at the camp, and counsel argue that Dugan stepped out of his employment when he went with the refrigerator car, and, further, that he subjected himself to unnecessary danger by riding in the coal compartment of the tank car, and especially by climbing onto the tank car and filling it with water, as he had no such duty. It appears from the testimony of Maline that Dugan's duties were routine and that Maline was not accustomed to giving him daily orders; that it was, in general, Dugan's duty to go to the station and look after the foodstuffs. It is argued that Dugan's duties did not require his riding on this train, but counsel overlooks the fact that it was not customary to take the refrigerator car to the station for supplies, but it was the duty of Dugan to get the supplies and load them into that car. Defendant in error's counsel say that when Dugan assumed a dangerous place he went outside the scope of his employment. It appears that the coal compartment of the tank car was enclosed at one end and two sides and the other end was open. Such is the usual construction of a tank car or tender of this kind.

Dugan testified that he was facing the enclosed end of the coal compartment, with his hands resting on the top of one of the enclosed sides of the compartment. While he admits that he went outside the scope of his employment to put the water into the tank, yet his evidence is that he had returned to his position in the coal compartment, and the fact that the train had traveled back to the station before this accident occurred, tends to corroborate his evidence.

It is the plan and purpose of the Workmen's Compensation act that courts shall review all questions of law and fact presented by the record and where it is found that the

decision of the commission is without substantial foundation in the evidence, or is against its manifest weight, it is the duty of the court to set that decision aside, (*Porter* v. *Industrial Com.* 352 Ill. 392; *Dornblaser* v. *Industrial Com.* 349 id. 61;) but it is only where the decision of the Industrial Commission is without substantial foundation in the evidence or its finding is manifestly against the weight of the evidence that such finding should be set aside. (*Peabody Coal Co.* v. *Industrial Com.* 349 Ill. 160; *Cuneo Press Co.* v. *Industrial Com.* 341 id. 569.) Upon review, this court is not bound by the findings of the circuit court but will determine the questions of law and fact involved according to its own judgment. *Raffaelle* v. *Industrial Com.* 326 Ill. 166; *de Carrion* v. *Industrial Com.* 370 id. 474.

From a review of the record we cannot say that the findings and the award of the commission were contrary to the weight of the evidence and it was, therefore, error for the circuit court to set aside the award of the commission on the question whether the accident arose out of and in the course of Dugan's employment.

Defendant in error argues that Dugan was not its employee. Its counsel says that the provisions of the contract made between itself and the railway company show that the commissary company was not an independent contractor but merely the agent of the railway company, therefore Dugan was an employee of the railway company. The contract provides, among other things, that the location of the boarding camp shall be determined by the railway company; that the commissary company shall maintain an employment office at the camp, without expense to the railway company, for the purpose of recruiting labor for the railway company; that the railway company agrees to furnish all necessary cars properly fitted with bunks and heating stoves, ready for boarding and lodging the men, and without expense, to furnish necessary water, ice and fuel, and

janitor service for the bunk cars. By the contract the railway company agrees to transport over its road, free of charge, the commissary company and its necessary employees, supplies and equipment, while on the business mentioned in the contract. By the contract, the railway company also agrees to deduct from the wages of the trackmen and other laborers the amount due the commissary company for board and to pay the same to the commissary company.

The principal consideration which distinguishes an employee from an independent contractor is the right to control the manner of doing the work. (*Decatur Railway and Light Co.* v. *Industrial Board,* 276 Ill. 472.) The test of the relationship is the right to control. It is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contractor and a servant or agent. An independent contractor is one who undertakes to produce a given result and, in the actual execution of the work, is not under the control or orders of the person for whom he does the work, but uses his own discretion in things not specified. He contracts to do a specific piece of work, furnishing his own assistants, executing the work either entirely according to his own ideas or in accordance with a certain plan previously given him by the person for whom the work is done. He discharges his duties under that contract without being subject to the orders of the latter, with respect to the details of the work. *Hartley* v. *Red Ball Transit Co.* 344 Ill. 534; *LaMay* v. *Industrial Com.* 292 id. 76; *Meredosia Levee District* v. *Industrial Com.* 285 id. 68.

As was pointed out in *Nelson Bros. & Co.* v. *Industrial Com.* 330 Ill. 27, it is impossible to lay down a hard and fast rule as to the terms "employee" and "independent contractor," as each case must depend largely on its own facts. The defendant in error commissary company was engaged in the business of providing board and lodging in camps to railway employees. The railway company had no super-

vision or direction over the manner and details of supplying this board, the preparation of food, the choice of hiring the cook or his helpers, the purchasing of food, mattresses, blankets and other supplies. The fact that the railway company furnished the cars and transportation, water, ice and fuel, did not give it control over the undertaking of furnishing board and lodging. The contract contemplated the commissary company should hire its own employees and the railway company agreed to transport the employees of the commissary company to and from the camps when they were traveling on business embraced in the contract. The commissary company assumed all risks of loss to its own property and that of its employees. The contract could be terminated by the railway company by giving written notice. This, however, is not control. The contract does not contemplate that the commissary company shall be in the position of an agent of the railway company. We are of the opinion that defendant in error was an independent contractor and that Dugan was its employee, and not an employee of the railway company.

Counsel for defendant in error also argue that Dugan is improving and that it does not appear from the evidence that he was permanently disabled. This contention is not borne out by the record. He received a broken back resulting in a paralysis of both legs and has been in the hospital from the time of the injury until the present time. Although he has shown improvement, the evidence does not indicate that he is not permanently disabled.

However, an error was made by the arbitrator and the commission, in computing the award. The award was based on the average yearly earnings of $696.25 for the year preceding the injury, or a weekly wage of $13.39. At the time of the accident plaintiff in error was earning $20 per month, plus room and board, but no evidence was offered of the value of room and board. At any event, plaintiff in error would be entitled to the minimum for total disability under section 8(f) of the act. This minimum is

$7.50 beginning on the day of the accident until the sum of $2500 has been paid, and an annual pension payable monthly equal to twelve per cent for each year of a death benefit of $2500, or $25 per month. As we have seen, the pension granted was for $27.85 per month. This was an erroneous computation. In all other respects the finding of the arbitrator and the Industrial Commission is correct. The circuit court erred in reversing and setting aside the award.

The judgment of the circuit court is reversed and the award of the Industrial Commission, as modified in conformity with this opinion, is confirmed.

*Judgment reversed;—award modified and confirmed.*

Per CURIAM: A petition for rehearing accompanied by a motion to amend the opinion has been filed, and upon consideration thereof, it appears from the record that, in addition to the sum of $2632.45 found due by the arbitrator as medical and hospital bills unpaid up to April 15, 1937, undisputed evidence was offered before the commission, on review, showing a further accumulation of medical and hospital bills up to September 16, 1937, amounting to $1105.02. The commission affirmed the award of the arbitrator without entering of record the additional accumulation of medical and hospital bills. The opinion heretofore filed confirmed the commission's award, except in a minor detail.

Under section 8a of the Workmen's Compensation act (Ill. Rev. Stat. 1937, chap. 48, par. 145) compensation for injury not resulting in death includes necessary medical and hospital bills. The award of the commission, therefore, carried with it as a matter of law such bills as were shown, without dispute on the hearing before the commission, to have been incurred. Therefore, confirmation of the award of the commission includes confirmation also of such additional medical and hospital bills. This statement is added to the opinion herein to make clear the rights of the parties herein.